In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-02-00127-CR
______________________________


ROBERT A. BLUMENSTETTER, Appellant
 
V.
 
THE STATE OF TEXAS, Appellee


                                              

On Appeal from the 123rd Judicial District Court
Panola County, Texas
Trial Court No. 2001-C-021


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Justice Ross


O P I N I O N

          Robert A. Blumenstetter was convicted by a jury of intoxicated assault.


 The jury
assessed the maximum punishment of ten years' imprisonment and a $10,000.00 fine.
          In Blumenstetter v. State, 117 S.W.3d 541, 543–45 (Tex. App.—Texarkana 2003,
order), we determined the indictment under which Blumenstetter was tried was a valid
indictment presented to the 123rd Judicial District Court of Panola County during its regular
term. We abated Blumenstetter's appeal, however, and remanded the case to the trial
court after determining Blumenstetter was denied assistance of counsel during the critical
period for filing a motion for new trial. Id. at 545–48. We remanded the case to the trial
court to the point at which Blumenstetter was convicted and his sentence imposed. Id. at
547. Blumenstetter filed a motion for new trial with the trial court. The trial court held a
hearing on that motion and denied it by written order.  
          We now address Blumenstetter's remaining points of error. He contends the trial
court erred by allowing the State's expert forensic chemist to testify to a legal conclusion
and by incorrectly instructing the jury on community supervision. He also contends he was
denied effective assistance of counsel. 
 
Background Facts
          The State's evidence showed that a two-car collision occurred in Panola County
involving a Ford pickup truck and a Ford Thunderbird automobile. Bruce Whitaker, the first
person at the scene, testified that Blumenstetter was behind the wheel of the pickup truck
when he arrived, that Blumenstetter smelled of alcohol, and appeared intoxicated. The
automobile was driven by Carla Colburn. Carla's son, Christian, was a passenger in that
vehicle and sustained life-threatening injuries. 
          David Rice, the Texas State Trooper who investigated the accident, testified the
pickup truck, driven by Blumenstetter, crossed the center line and struck the Colburn
vehicle. He also testified the intoxication of Blumenstetter was a factor in the accident. 
Blumenstetter's blood was drawn at a medical center two hours after the accident, and a
blood-alcohol test revealed his intoxication at .20 grams of alcohol per 100 milliliters of
blood, or .12 over the legal limit, which is .08.
Legal Conclusion
          Blumenstetter contends the trial court erred by allowing Dennis Pridgen, the State’s
expert forensic chemist, to testify to a legal conclusion. The State called Pridgen, a
forensic chemist employed by the Texas Department of Public Safety Crime Laboratory,
to testify concerning Blumenstetter's blood-alcohol test. The chemist testified regarding
the procedures used in conducting a blood-alcohol test and the results obtained from
Blumenstetter's test. At the conclusion of his testimony, the State asked a series of
questions to determine whether Blumenstetter was intoxicated at the time of the accident: 
          Q.       I want to know your opinion as to whether or not the defendant
was legally intoxicated. If your test showed .20, which is two and a half
times, two hours later, do you have an opinion as to whether or not the
defendant was legally intoxicated at 5:30 p.m. when the accident occurred?
 
          A.       Yes, sir. I would find it extremely difficult to come up with a
scenario that would allow him not to be above .08 at the time of the accident,
based upon an answer of .2 two hours later. 
 
          . . . .
 
          Q.       Okay. And you understand the burden of proof in a criminal
case is beyond a reasonable doubt?
 
          A.       Yes, sir.
 
          Q.       In your opinion, do you feel that it is -- that the defendant was
legally intoxicated at 5:30 p.m. when he struck the other vehicle, beyond a
reasonable doubt?
 
          A.       Yes, sir. 
         
          Blumenstetter did not object to this testimony. He therefore failed to preserve any
error for review. See Armstrong v. State, 718 S.W.2d 686, 699 (Tex. Crim. App. 1985) (op.
on reh'g). This point of error is overruled.
Jury Charge on Community Supervision 
          Blumenstetter contends the trial court erred by instructing the jury that, if it
determined community supervision was appropriate, it was to assess the length of
community supervision. The appropriate method for analyzing errors in jury charges is to
first determine whether the jury charge contains error, and second, whether sufficient harm
resulted from the error to require reversal. Abdnor v. State, 871 S.W.2d 726, 731–32 (Tex.
Crim. App. 1994). The jury charge at the punishment phase of the trial stated in relevant
part:
          Our law provides that when the punishment assessed by a jury shall
not exceed ten years confinement, the jury may recommend probation for a
period of any term of years authorized for the offense for which the
defendant is convicted without regard to the term of punishment assessed,
but in no event may the period of probation be greater than ten years nor
less than the minimum prescribed for the offense for which the defendant
has been convicted. You are further instructed that if the jury fixes a
punishment which may be legally probated, and if the jury recommends that
such sentence be probated, the law provides that the jury shall determine
and state in its verdict the length of time the defendant shall remain on
probation. 
 
          . . . . If the punishment assessed by you is not more than ten years
confinement in the Texas Department of Criminal Justice, Institutional
Division and you further find that he has never before been convicted of a
felony in this or any other state, and if you recommend probation in this case,
then let your verdict show the punishment which you assess and show that
the defendant has never before been convicted of a felony in this or any
other state, and further show the term of years for which you recommend
that his sentence be probated.  
 
          This charge to the jury was in error, as it was in contradiction of Article 42.12,
Section 4(b) of the Code of Criminal Procedure, which provides that:
If the jury recommends to the judge that the judge place the defendant on
community supervision, the judge shall place the defendant on community
supervision for any period permitted . . . as appropriate. 
 
Tex. Code Crim. Proc. Ann. art. 42.12, § 4(b) (Vernon Supp. 2004).
          The standard of review for errors in the jury charge depends on whether the
defendant properly objected. Mann v. State, 964 S.W.2d 639, 641 (Tex. Crim. App. 1998); 
Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g); Gornick v.
State, 947 S.W.2d 678, 680 (Tex. App.—Texarkana 1997, no pet.). If a proper objection
was raised, reversal is required if the error is "calculated to injure the rights of defendant." 
Almanza, 686 S.W.2d at 171. In other words, an error that has been properly preserved
is reversible unless it is harmless. Id. If a defendant does not object to the charge,
reversal is required only if the harm is so egregious the defendant has not had a fair and
impartial trial. Rudd v. State, 921 S.W.2d 370, 373 (Tex. App.—Texarkana 1996, pet.
ref'd). 
          Where there has been no objection, we will reverse the cause only if an appellant
has shown the error caused him egregious harm. Abdnor, 871 S.W.2d at 732; see
Peterson v. State, 942 S.W.2d 206, 208 (Tex. App.—Texarkana 1997, pet. ref'd). 
Egregious harm consists of errors affecting the very basis of the case or that deprive the
defendant of a valuable right, vitally affect a defensive theory, or make the case for
conviction or punishment clearly and significantly more persuasive. Saunders v. State, 
817 S.W.2d 688, 692 (Tex. Crim. App. 1991); Hall v. State, 937 S.W.2d 580, 583 (Tex.
App.—Texarkana 1996, pet. ref'd). We determine harm in light of the entire jury charge,
the state of the evidence, including contested issues and the weight of the probative
evidence, the argument of counsel, and any other relevant information revealed by the
record as a whole. Mann, 964 S.W.2d at 641; Rudd, 921 S.W.2d at 373. The purpose is
to illuminate the actual, not just the theoretical, harm to the accused. Rudd, 921 S.W.2d
at 373; Hines v. State, 978 S.W.2d 169, 175 (Tex. App.—Texarkana 1998, no pet.).
          Blumenstetter did not object to the jury charge at trial, and the error did not cause
him egregious harm. The instruction erroneously provided that the jury was to recommend
the period of community supervision, if it first decided community supervision was
appropriate. The jury did not recommend community supervision; therefore, it never
needed to apply the erroneous instruction. The false impression given by the instruction
would have likely inclined the jury to consider community supervision, rather than deny it. 
Under these circumstances, we hold Blumenstetter was not harmed by the erroneous
instruction. 
Ineffective Assistance of Counsel 
          Blumenstetter further contends he was denied effective assistance of counsel. He
contends his trial counsel was deficient in failing to: (1) file a motion to suppress the blood
test; (2) object to the forensic chemist testifying on extrapolation; (3) object to the forensic
chemist testifying to a legal conclusion; (4) object to the jury charge on punishment which,
instructed the jury it was to assess the duration of any community supervision; and
(5) object to the jury charge on punishment, which provided an incomplete instruction on
parole. 
          The traditional standard of testing claims of ineffective assistance of counsel is set
out in Strickland v. Washington, 466 U.S. 668 (1984), and adopted for Texas constitutional
claims in Hernandez v. State, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986). To prevail on
this claim, an appellant must prove by a preponderance of the evidence (1) that his or her
counsel's representation fell below an objective standard of reasonableness, and (2) that
the deficient performance prejudiced her or his defense. Strickland, 466 U.S. at 687;
Rosales v. State, 4 S.W.3d 228, 231 (Tex. Crim. App. 1999). To meet this burden, the
appellant must prove that the attorney's representation fell below the standard of prevailing
professional norms and that there is a reasonable probability that, but for the attorney's
deficiency, the result of the trial would have been different. Tong v. State, 25 S.W.3d 707,
712 (Tex. Crim. App. 2000). Under this standard, a claimant must prove that counsel's
representation so undermined the proper functioning of the adversarial process that the
trial cannot be relied on as having produced a just result. Strickland, 466 U.S. at 686.
          Our review of counsel's representation is highly deferential; we indulge a strong
presumption that counsel's conduct falls within a wide range of reasonable representation. 
Id. at 689; Tong, 25 S.W.3d at 712. This Court will not second-guess through hindsight the
strategy of counsel at trial; nor will the fact that another attorney might have pursued a
different course support a finding of ineffectiveness. Blott v. State, 588 S.W.2d 588, 592
(Tex. Crim. App. 1979). That another attorney, including appellant's counsel on appeal,
might have pursued a different course of action does not necessarily indicate ineffective
assistance. Harner v. State, 997 S.W.2d 695, 704 (Tex. App.—Texarkana 1999, no pet.). 
Any allegation of ineffectiveness must be firmly founded in the record, and the record must
affirmatively demonstrate the alleged ineffectiveness. Thompson v. State, 9 S.W.3d 808,
813 (Tex. Crim. App. 1999).
          As far as strategic or tactical reasons for counsel's action or inaction, in the absence
of direct evidence of counsel's reasons for the challenged conduct, an appellate court will
assume a strategic motivation if any can be imagined. Garcia v. State, 57 S.W.3d 436,
440 (Tex. Crim. App. 2001). We will not conclude the challenged conduct constitutes
deficient performance unless the conduct was so outrageous no competent attorney would
have engaged in it. Id.; see also Thompson, 9 S.W.3d at 814.
          If the first prong is met, the appellant must also show that counsel's performance
prejudiced the defense. Strickland, 466 U.S. at 691–92. It is not enough for the defendant
to show that the errors had some conceivable effect on the outcome of the proceeding. 
Id. Instead, the Strickland prejudice prong requires the defendant to show there is "a
reasonable probability that, but for counsel's unprofessional errors, the result of the
proceeding would have been different." Id. at 694. A reasonable probability is a probability
sufficient to undermine the court's confidence in the outcome. Id. When addressing this
second step of Strickland, the reviewing court should examine counsel's errors, not as
isolated incidents, but in the context of the overall record. Bridge v. State, 726 S.W.2d
558, 571 (Tex. Crim. App. 1986). Additionally, the reviewing court need not examine both
Strickland prongs if one cannot be met. Strickland, 466 U.S. at 697. In Hernandez v.
State, 988 S.W.2d 770, 773 (Tex. Crim. App. 1999), the Texas Court of Criminal Appeals
held that the Strickland analysis applies equally to the punishment phase.
1. Failure to file a motion to suppress the blood test
          Blumenstetter contends his blood test was taken in violation of Section 724.12 of
the Texas Transportation Code and the Fourth Amendment to the United States
Constitution. He contends his trial counsel should have, therefore, moved to suppress the
blood test. At the hearing on the motion for new trial, Blumenstetter's trial counsel testified
he reviewed the evidence from the State, interviewed the laboratory technician, interviewed
the state trooper, and determined that the blood specimen was taken properly. We agree.
          Blumenstetter contends Chapter 724 of the Transportation Code requires a person
to be arrested before that person's blood specimen can be taken.


 While Chapter 724 of
the Transportation Code enlarges on what is constitutionally required with regard to blood
samples when a person is under arrest for an intoxication-related offense, it does not apply
to persons who are not under arrest when the blood sample is taken. State v. Laird, 38
S.W.3d 707, 713 (Tex. App.—Austin 2000, pet. ref'd). Accordingly, Texas courts apply the
probable cause and exigent circumstances test in cases where a blood sample is taken
from someone not under arrest. Id. (citing Pesina v. State, 676 S.W.2d 122, 123, 125
(Tex. Crim. App. 1984); Weaver v. State, 721 S.W.2d 495, 497 (Tex. App.—Houston [1st
Dist.] 1986, pet. ref'd); Burkhalter v. State, 642 S.W.2d 231, 232–33 (Tex. App.—Houston
[14th Dist.] 1982, no pet.)).
          Blumenstetter contends the taking of the blood was an unlawful search and seizure
under the United States Constitution. The taking of a blood sample is a search and seizure
under both the federal and Texas constitutions. Aliff v. State, 627 S.W.2d 166, 169 (Tex.
Crim. App. 1982). However, when officers have probable cause, exigent circumstances,
and a reasonable method of extraction, taking a blood sample without a warrant or consent
is not an unreasonable search and seizure, and does not violate the Fourth Amendment. 
See U.S. Const. amend. IV; Schmerber v. California, 384 U.S. 757, 767–68 (1966); Aliff,
627 S.W.2d at 169–70. 
          First, exigent circumstances exist in cases such as these because alcohol in blood
is quickly consumed and the evidence may be lost forever. See Aliff, 627 S.W.2d at
169–70. Second, the taking of blood by a medical laboratory technician in a hospital is a
reasonable method of extraction. Finally, probable cause existed to arrest Blumenstetter,
who, according to the first person at the scene, was the sole occupant of the Ford pickup
truck and was behind the wheel. Steven Mims, responding to the accident as a volunteer
firefighter and who was the second person to arrive at the scene, advised police he passed
Blumenstetter's Ford pickup just before the accident, that the driver of the pickup swerved
into his lane, and that the driver was driving erratically. He testified that it was snowing and
that the roads were slick. He estimated the driver of the pickup was traveling at sixty miles
per hour. Rice conducted the investigation and determined that Blumenstetter crossed the
center line while driving and struck the Thunderbird head-on. He testified that, at the time
he was called to the scene of the accident, it had started to snow, but it "wasn't really
affecting the driving." In his opinion, the weather was not a factor in the cause of the
accident. He testified there was an overwhelming smell of metabolized alcohol inside the
Ford pickup truck. These circumstances indicate there was probable cause to arrest
Blumenstetter. See Pesina, 676 S.W.2d at 127 (finding probable cause where defendant
found by police officer under wheel of wrecked pickup truck with strong odor of alcohol on
breath). Therefore, trial counsel's omission in not moving to suppress the blood test was
not error or below an objective standard of reasonableness.
2. Failure to object to testimony of State's forensic chemist
          Blumenstetter contends his trial counsel should have objected to the forensic
chemist testifying as an expert on extrapolation and also to the extrapolation testimony
itself. He also contends trial counsel should have objected to the forensic chemist
testifying to his conclusion Blumenstetter was, beyond a reasonable doubt, legally
intoxicated at the time of the accident. We agree. 
          The State's expert forensic chemist testified as follows:
          Q.       . . . . Now, Mr. Pridgen, are you familiar with the term "peaking"
when we're referring to alcohol and alcohol concentration?
 
          A.       Yes, sir.
 
          Q.       And in layman's terms, the speed with which I could get drunk
would depend upon my size, what I had eaten, how fast my metabolism
worked and the body broke down the alcohols and digested them and sent
them on into my nervous system, something like that, right?
 
          A.       Yes, sir, along with how fast you're drinking.
 
          Q.       Yes, sir.
 
          A.       Your size is less important than the other factors that we
mentioned. 
 
          Q.       And the amount?
 
          A.       Yes, sir.
 
          Q.       If I got a big concentration, as opposed to starting in the
morning and just constantly drinking, right?
 
          A.       If we're talking about speed, yes, sir. 
 
          Q.       Yes, sir. Okay. Now, I want to -- your test -- and I believe we
could -- the evidence is going to show the blood was drawn at 7:30, I believe,
or 7:35.
 
          A.       7:30.
 
          Q.       I believe the record is going to show the blood was drawn at
7:30 p.m. I think the accident report is going to show the wreck occurred at
5:30 p.m.
          Now, I'm going to ask you to assume after the wreck that the
defendant did not consume any other alcohol, he didn't consume any alcohol
at the scene, and that the hospital didn't give him any alcohol to drink while
he was at the hospital. So all alcohol consumption stopped at 5:30. Okay?
 
          A.       Yes, sir.
 
          Q.       I want to know your opinion as to whether or not the defendant
was legally intoxicated. If your test showed .20, which is two and a half
times, two hours later, do you have an opinion as to whether or not the
defendant was legally intoxicated at 5:30 p.m. when the accident occurred?
 
          A.       Yes, sir. I would find it extremely difficult to come up with a
scenario that would allow him not to be above .08 at the time of the accident,
based upon an answer of .2 two hours later.
 
          Q.       Okay. Because as people consume alcohol, their bodies get
more and more -- 
 
 
          . . . .
 
          Q.       . . . . As a person drinks, they become more intoxicated; and
then they quit drinking, they still go up to a point, peak; and then they turn
around and start going back down as the alcohol is absorbed. Is that
correct?
 
          A.       As it's eliminated.
 
          Q.       As it's -- I'm sorry. As it's eliminated, it goes down. And I want
to ask you that if the defendant had IV's in his system from the hospital,
would that help eliminate the alcohol?
 
          A.       No, sir. It wouldn't help eliminate it, but it would reduce the
concentration by dilution. Just like if you take a grape drink or grape
concentrate or orange juice concentrate out of the refrigerator and you add
water to it, where you had 100 percent orange juice then you have 50
percent orange juice after you add water. As they add the IV solutions into
his bloodstream, then they dilute his blood and everything that's in it,
including the alcohol, and reduce the concentration of alcohol that's present.
 
          Q.       Okay. And you understand the burden of proof in a criminal
case is beyond a reasonable doubt?
 
          A.       Yes, sir.
 
          Q.       In your opinion, do you feel that it is -- that the defendant was
legally intoxicated at 5:30 p.m. when he struck the other vehicle, beyond a
reasonable doubt?
 
          A.       Yes, sir. 
 
Blumenstetter's trial counsel cross-examined Pridgen as follows:

          Q.       Mr. Pridgen . . . . I don't pretend to be a chemist, I'm not trying
to ask you trick questions, and I don't believe we have any chemists on our
jury.
          So what I need to ask is that -- when it's got a .20 grams of alcohol per
100 hundred [sic] milliliters two hours after the accident -- and I believe
you've testified that you believe he was 0.80 or -- excuse me -- 0.08 or more
at the time of the accident. Is that what you're testifying to?
 
          A.       I would find -- I said I could not come up with a logical scenario
that would allow him to be below that. 
 
          Q.       What do you think he was? Do you have an opinion on that?
 
          A.       I really -- no, sir. I could not give you an exact amount that he
was at the time because of all the factors we've introduced, the dilution from
the IV's and all that sort of stuff. 
          I just do not see a way that he could have been below that, based on
the fact that he would have had to have consumed an enormous amount of
alcohol moments before the accident, and I mean moments before the
accident, that had not had a chance to enter into his bloodstream in order for
him to be to a .2 or above, which the dilution indicates he could have been
higher than that at 7:30.
 
          Q.       But you really don't know what IV's were given to him or
anything like that, do you?
 
          A.       No, sir. No, I don't. 
 
          Q.       This was a scenario that was presented to you by the DA; is
that correct?
 
          A.       Yes, sir. 
 
          Q.       And we haven't really heard any testimony as to what was -- or
you haven't been presented any fact situation as to what was done to him at
the hospital, have you?
 
          A.       No, sir. I only -- I have been made aware that he was given
IV's. But how much or anything beyond that, I have not been made aware
of. 
 
A. Retrograde extrapolation testimony
          Blumenstetter's trial counsel testified at the hearing on the motion for new trial that
he did not object to the forensic chemist testifying as an expert on extrapolation because,
drawing on his past experience as a prosecutor for ten years, he felt that, if he objected,
the State would "come back and qualify him for that" and that, if he objected, it would only
reinforce the expert's opinion. Counsel testified his strategy was to leave doubt in the
jurors' minds regarding intoxication by emphasizing that Pridgen was only guessing as to
Blumenstetter's intoxication at the time of the accident. He did admit, however, he was
unfamiliar with the Texas Court of Criminal Appeals case of Mata v. State, 46 S.W.3d 902
(Tex. Crim. App. 2001). 
          While counsel may have been aware of Pridgen's qualifications as an expert, had
he been familiar with the Mata case, he would have known that Pridgen's testimony
concerning the retrograde extrapolation in this case was unreliable and inadmissible. 
          In Mata, the Texas Court of Criminal Appeals discussed "retrograde extrapolation"
in detail. The court defined retrograde extrapolation as the computation back in time of the
blood-alcohol level, i.e., the estimation of the level at the time of driving based on a test
result from some later time. Id. at 908–09. As alcohol is consumed, it passes from the
stomach and intestines into the blood, a process referred to as absorption. Id. at 909. 
When the alcohol reaches the brain and nervous system, the characteristic signs of
intoxication begin to show. Id. The length of time necessary for the alcohol to be absorbed
depends on a variety of factors, including the presence and type of food in the stomach,
the person's gender, the person's weight, the person's age, the person's mental state, the
drinking pattern, the type of beverage consumed, the amount consumed, and the time
period of alcohol consumption. Id. At some point after drinking has ceased, the person's
blood-alcohol content (BAC) will reach a peak. Id. After the peak, the BAC will begin to
fall as alcohol is eliminated from the person's body. Id. The body eliminates alcohol
through the liver at a slow but consistent rate. Id.
          The court went on to explain the "BAC curve," which represents the rise and fall of
an individual's BAC as his or her body absorbs and eliminates alcohol. Id. A reading from
a single breath test will not reflect where the person is on her or his BAC curve. Id. In
other words, it will not indicate whether the person is in the absorption phase, at the peak,
or in the elimination phase. Id. So if a driver is tested while in the absorption phase, his
or her BAC at the time of the test will be higher than his or her BAC while driving. Id. If
tested while in the elimination phase, the BAC at the time of the test could be lower than
while driving, depending on whether the driver had reached her or his peak before or after
the driver was stopped. Id. Obviously, the greater the length of time between the driving
and the test, the greater the potential variation between the two BACs. Id. at 909–10.
          The court cited numerous studies on retrograde extrapolation, including one which
cautioned that, "[h]owever useful such estimates may be in [DWI] cases, it should be
remembered that the process of alcohol absorption is highly variable. The limitations and
pitfalls associated with retrograde extrapolations are often not appreciated by laymen and
the courts." Id. at 911. The study concluded that "[a]ny attempt at retrograde extrapolation
should be made with caution, and performed by persons able to assess and discuss the
applicability of a retrograde extrapolation to a particular situation." Id.
          The court concluded that the science of retrograde extrapolation can be reliable in
a given case. Id. at 916. The retrograde extrapolation expert's ability to apply the science
and explain it with clarity to the fact-finder is a paramount consideration. Id. The expert
also must show some understanding of the difficulties associated with retrograde
extrapolation, as well as an awareness of the subtleties of the science and the risks
inherent in any extrapolation. Id. Finally, the expert must be able to clearly and
consistently apply the science. Id.
          In evaluating the reliability of retrograde extrapolation, a court should also consider
(a) the length of time between the offense and the administration of the test(s); (b) the
number of tests given and the interval between each; and (c) to what extent, if any, the
individual characteristics of the defendant were known to the expert in providing his or her
extrapolation. Id. These characteristics and behaviors might include, but are not limited
to, the person's weight and gender, the person's typical drinking pattern and tolerance for
alcohol, how much alcohol the person consumed on the day or night in question, what the
person drank, the duration of the drinking spree, the time of the last alcoholic drink, and
how much and what the person had to eat either before, during, or after the consumption
of alcohol. Id. 
          The expert need not know every personal fact about the defendant to produce an
extrapolation with the appropriate level of reliability. Id. If this were the case, no valid
extrapolation could ever occur without the defendant's cooperation, given that a number
of facts known only to the defendant are essential to the process. Id. If more than one test
is administered at reasonable intervals, and the first test is conducted within a reasonable
time of the offense, then an expert potentially could create a reliable estimate of the
defendant's blood-alcohol content with limited knowledge of personal characteristics and
behaviors. See id. In contrast, a single test conducted some time after the offense could
result in a reliable extrapolation only if the expert had knowledge of many personal
characteristics and behaviors of the defendant. See id. A case would fall "in the middle"
if the expert is made aware of two or three of the defendant's personal characteristics and
a single test was administered to the defendant within a reasonable length of time from the
traffic stop. Id. at 916–17. 
          In this case, Pridgen did not explain the science of retrograde extrapolation to the
jury with any clarity. His only references were to its general principles, and he did not state
what elimination rate he used. He also demonstrated no understanding of the difficulties
associated with a retrograde extrapolation or the subtleties and risks of the science. 
Instead, his testimony was unequivocal that he could not come up with a logical scenario
that would have had Blumenstetter below the legal limit at the time he was driving. This
testimony was erroneous and fed the average individual's misconception that BACs only
go down after time. 
          Regarding the other factors, there was only one test of Blumenstetter's BAC, and
it occurred two hours after the alleged offense. As the Mata court found, this is a
significant length of time and seriously affects the reliability of any extrapolation. See id.
at 912, 917 (finding potential rate of error increased as time went on, and "this variability
was particularly large" when extrapolation back one hour or more was attempted). In
addition, Pridgen did not testify to one single personal characteristic of Blumenstetter. He
did not testify that he based his conclusion on whether Blumenstetter had eaten anything,
or how much; how much Blumenstetter had to drink; what Blumenstetter had to drink; when
his last drink was; the length of Blumenstetter's drinking spree; or Blumenstetter's weight. 
          We conclude that Pridgen's testimony on retrograde extrapolation was clearly
inadmissible under Mata. To not object to the admission of prejudicial and arguably
inadmissible evidence may be strategic; to not object to the admission of prejudicial and
clearly inadmissible evidence has no strategic value. Ex parte Menchaca, 854 S.W.2d
128, 132 (Tex. Crim. App. 1993) (citing Lyons v. McCotter, 770 F.2d 529, 534 (5th Cir.
1985)). A criminal defense lawyer must have a firm command of the facts of the case as
well as governing law before such lawyer can render reasonably effective assistance to his
or her client. Jackson v. State, 766 S.W.2d 504, 509 (Tex. Crim. App. 1985).
Blumenstetter's trial counsel testified he was unfamiliar with Mata. That lack of knowledge
prevented him from providing reasonably effective assistance to Blumenstetter. 
          Trial counsel testified he did not object because his strategy was to argue to the jury
that Pridgen was guessing and that no one really knew Blumenstetter's level of intoxication
at the time of the accident. He felt that, if he did object, the State would simply prove up
Pridgen's qualifications and solidify his testimony to the jury. It is highly unlikely the State
could have proven up the extrapolation testimony as reliable testimony. The Mata court
stated a scenario where a single test conducted some time after the offense could result
in a reliable extrapolation if the expert had knowledge of many personal characteristics and
behaviors of the defendant. Blumenstetter testified at trial, and several of the relevant
factors could have been elicited from him. It is unclear, however, whether those factors
would have proven up Pridgen's conclusion or contradicted it. Blumenstetter testified he
had consumed two large drinks of alcohol just before the accident. As the Mata court
pointed out, a "chug-a-lug" method of drinking hard liquor would support the position that
Blumenstetter was in the absorption phase at the time of the accident, therefore supporting
the position that the subsequent BAC was higher than his BAC at the time of the accident. 
In light of the fact Pridgen did not explain the science of retrograde extrapolation to the jury
with any clarity, did not demonstrate an understanding of the difficulties associated with
retrograde extrapolation, did not state what elimination rate he used, and the fact that
Blumenstetter's BAC was taken two hours after the accident, the State would not have
been able to prove up Pridgen's testimony on extrapolation as reliable testimony. Trial
counsel's strategy to attack Pridgen's testimony as guesswork was not reasonably effective
assistance because he could have completely excluded the testimony. By failing to object
to Pridgen's testimony, counsel's assistance fell below an objective standard of
reasonableness. 
B. Legal conclusion
          Blumenstetter also contends trial counsel should have objected to Pridgen's 
testimony that Blumenstetter was, beyond a reasonable doubt, legally intoxicated at the
time of the accident, on the ground he was testifying to a legal conclusion. Rule of
Evidence 704 provides that "[t]estimony in the form of an opinion or inference otherwise
admissible is not objectionable because it embraces an ultimate issue to be decided by the
trier of fact." Tex. R. Evid. 704. Blumenstetter cites Hopkins v. State, 480 S.W.2d 212,
218 (Tex. Crim. App. 1972), where the Texas Court of Criminal Appeals concluded that,
before an expert's opinion testimony can be admissible: (1) the expert must be competent
and qualified to testify; (2) the subject must be one on which the aid of an expert opinion
will be of assistance to the jury; and (3) the expert's testimony may not state a legal
conclusion. 
          The Texas Rules of Evidence, however, do not specifically forbid a witness from
testifying to legal conclusions. An expert may offer his or her opinion as to a mixed
question of law and fact, so long as that opinion is based on proper legal concepts. See
Tex. R. Evid. 704; Birchfield v. Texarkana Mem'l Hosp., 747 S.W.2d 361, 365 (Tex. 1987);
Lum v. State, 903 S.W.2d 365, 370 (Tex. App.—Texarkana 1995, pet. ref'd). 
          This Court has described a mixed question of law and fact as one in which a
standard or measure has been fixed by law and the question is whether the person or
conduct measures up to that standard. Crum & Forster, Inc. v. Monsanto Co., 887 S.W.2d
103, 134 (Tex. App.—Texarkana 1994, no writ). The classic example of a mixed question
of law and fact is whether certain actions constitute negligence. See Birchfield, 747
S.W.2d at 365.
          Under this guideline, it appears the question presented to Pridgen was a mixed
question of law and fact. Pridgen was asked whether the facts surrounding
Blumenstetter's drinking measured up to the legal standard of intoxication. 
          For a mixed question of law and fact to be admissible, however, it must meet the
requirements of expert testimony in general. An expert must be competent and qualified
to testify, and his or her opinion must be reliable and relevant. Tex. R. Evid. 702; Louder
v. De Leon, 754 S.W.2d 148, 149 (Tex. 1988). As previously discussed, Pridgen's
testimony was objectionable because he was not shown to be qualified as an expert on
retrograde extrapolation, nor was his testimony shown to be reliable.
          In addition, expert testimony concerning whether an issue is proven beyond a
reasonable doubt is not specialized knowledge which would assist a jury. Expert testimony
assists a juror when the expert's knowledge is "beyond that of the average juror" and would
help the juror understand the evidence or determine a fact issue. K-Mart Corp. v.
Honeycutt, 24 S.W.3d 357, 360 (Tex. 2000). When the jury is equally competent to form
an opinion about the ultimate fact issues or the expert's testimony is within the common
knowledge of the jury, the trial court should exclude the expert's testimony. Id. Rule 702
makes inadmissible expert testimony as to a matter which obviously is within the common
knowledge of jurors because such testimony, almost by definition, can be of no assistance. 
Id. As the Texas Court of Criminal Appeals noted in Paulson v. State, 28 S.W.3d 570, 571
(Tex. Crim. App. 2000), reasonable doubt has a commonly accepted meaning, and "[i]t is
not proper for the court to discuss what reasonable doubt is. The jury is as competent to
determine that as the court." Pridgen's testimony on whether Blumenstetter was
intoxicated beyond a reasonable doubt was, therefore, objectionable.
          Trial counsel testified at the motion for new trial he simply did not know why he had
not objected. Defense counsel, therefore, had no strategy by not objecting, and his failure
to so object fell below an objective standard of reasonableness. 
C. Prejudice
          We now must determine whether counsel's deficient performance prejudiced
Blumenstetter's defense. As previously stated, the Strickland prejudice prong requires the
defendant to show there is "a reasonable probability that, but for counsel's unprofessional
errors, the result of the proceeding would have been different." Strickland, 466 U.S. at
694. A reasonable probability is a probability sufficient to undermine the court's confidence
in the outcome. Id. The prejudice question is whether, absent counsel's error, the jury
"would have had a reasonable doubt respecting guilt." Id. at 695. When addressing the
second step of Strickland, we examine counsel's errors, not as isolated incidents, but in
the context of the overall record. Menchaca, 854 S.W.2d at 132. There are several factors
to determine whether the second step of Strickland has been met: the weight, nature, and
focus of the evidence presented to the jury; the nature of the prosecutor's closing
argument; and the relative role the evidence played in the outcome of the trial. Id. at 133. 
          The Texas Court of Criminal Appeals in Bagheri v. State, 119 S.W.3d 755, 763–64
(Tex. Crim. App. 2003), analyzed the harm when the trial court erroneously admits
retrograde extrapolation testimony. The court was examining the harmfulness of the error
under the nonconstitutional framework of whether the erroneously admitted testimony
might have prejudiced the jury's consideration of the other evidence or substantially
affected its deliberations. See id. at 763. We are analyzing the harmfulness in this
instance under the more stringent Strickland standard, but the court's analysis will be
helpful to our determination. The Bagheri court found that important factors include
"whether the State emphasized the error, whether the erroneously admitted evidence was
cumulative, and whether it was elicited from an expert." Id. The court found harm from the
admission of the extrapolation testimony, citing those factors. Id. The testimony was
elicited from an expert. Id. The state emphasized, throughout the trial from voir dire to
closing arguments, the fact that there would be scientific evidence from an expert showing
that appellant's alcohol concentration was greater than .10 at the time of operating the
vehicle. Id. The expert had testified in great detail about his qualifications and his "expert
opinion" on a number of subjects, including his opinion that the scientific theory behind
retrograde extrapolation is reliable. Id. The state, during closing argument, emphasized
the expert's qualifications and calculated the extrapolated range based on "scientifically
reliable, valid evidence." Id. The court also found the extrapolation testimony was not
cumulative evidence. Id. at 764. The court found that, although there was testimony from
the arresting officer about the appellant's apparent intoxication and poor performance on
the field sobriety tests, the appellant presented testimony supporting his assertion he was
not intoxicated, but fatigued, when he was stopped. Id. In addition, during voir dire,
numerous members of the jury panel expressed the belief that a person who fails a breath
test is "flat-out" guilty of driving while intoxicated. Id. Several veniremembers also believed
that alcohol concentration would therefore always be higher at the time of driving than it
would be on a later intoxilyzer test. Id. The court found it could not say with fair assurance
the erroneous admission of the retrograde extrapolation testimony did not influence the
jury, or had but a slight effect. Id.
          In this case, the retrograde extrapolation testimony was elicited from the State's
expert on forensic chemistry. The State emphasized the expert's conclusion on
Blumenstetter's intoxication level and emphasized throughout the trial that his opinion was
"beyond a reasonable doubt." During voir dire, the State informed the jury panel about
intoxication "peaking" and how there is a "going up" period in intoxication and a "going
down" period. The State told the jury panel that "the results are going to show an overage
an hour and a half later" and that "you're going to have to use your common sense. And
it doesn't matter if he was going up or coming down . . . if he was above .08 when he was
behind the wheel, he's intoxicated according to the law." He also mentioned to the jury
during opening statements an expert would testify Blumenstetter was intoxicated at the
time of the accident. Pridgen testified in unequivocal terms concerning Blumenstetter's
intoxication level at the time of the accident. He testified he could not come up with a
logical scenario to have Blumenstetter below .08 two hours before a .20 BAC. In fact, he
emphasized that opinion by stating Blumenstetter was intoxicated at the time of the
accident, beyond a reasonable doubt. During closing arguments, the State again
emphasized several times Pridgen's opinion that Blumenstetter was intoxicated, beyond
a reasonable doubt. 
          We find, however, that the expert's retrograde extrapolation testimony and
conclusion that Blumenstetter was intoxicated at the time of the accident, beyond a
reasonable doubt, was cumulative of other evidence, and the results of the proceeding
would not have been different had defense counsel objected. 
          Without reliable retrograde extrapolation testimony, it is unclear what
Blumenstetter's BAC was at the time of the accident. There is significant evidence,
however, that he was intoxicated at that time. Intoxicated is defined as "not having the
normal use of mental or physical faculties by reason of the introduction of alcohol . . . ; or
having an alcohol concentration of 0.08 or more." Tex. Pen. Code Ann. § 49.01(2) (Vernon
2003).


 Therefore, the jury only needed to believe beyond a reasonable doubt that either
his blood-alcohol concentration was .08 or more, or that he failed to have the normal use
of his mental or physical faculties by reason of introduction of alcohol into his body, at the
time of the accident. 
          There was substantial other evidence of Blumenstetter's intoxication at the time of
the accident. Whitaker testified Blumenstetter smelled of alcohol and appeared
intoxicated. Mims testified he passed a Ford pickup truck just before the accident, and the
driver was driving erratically and swerving into his lane. Mims identified Blumenstetter's
Ford pickup as the same vehicle he had to avoid moments before. Rice also smelled the
metabolized odor of alcohol inside Blumenstetter's truck and concluded Blumenstetter was
intoxicated. He based that conclusion on the smell of alcohol and because Blumenstetter
caused the accident by crossing the center line. 
          In addition, Blumenstetter testified he had consumed two alcoholic beverages,
starting at "about 4:30, quarter of 5:00." He testified that he had two vodka "screwdrivers"
mixed in a McDonald's cup and that he emptied the vodka bottle with the second
"screwdriver." Blumenstetter testified he did not remember the accident. There was no
evidence he consumed any alcohol after the accident, and his blood-alcohol reading of .20
two hours after the accident is relevant evidence he was intoxicated at the time he drove,
under either definition of intoxication, because it provided evidence he had consumed
alcohol. See Stewart v. State, No. 324-03, 2004 Tex. Crim. App. LEXIS 380 (Tex. Crim.
App. Mar. 3, 2004) (finding breath test results relevant and admissible without retrograde
extrapolation testimony because results were pieces in evidentiary puzzle for jury to
consider in determining whether person was intoxicated at time of driving). Therefore,
there was a substantial amount of evidence Blumenstetter was intoxicated at the time of
the accident. Based on this evidence, defense counsel's failure to object did not prejudice
Blumenstetter's defense because the result of the proceeding would not have been
different.
3. Failure to object to jury charge on punishment 
            Blumenstetter contends his trial counsel should have objected to the jury charge on
community supervision and parole. He contends the jury charge erroneously provided that
the jury was to assess the length of community supervision if it determined community
supervision was appropriate. We have already determined there was no harm to
Blumenstetter from this failure. In that analysis, we stated that the false impression given
by the instruction would have likely inclined the jury to consider community supervision,
rather than deny it. Trial counsel did not recall why he did not object to the proffered
instruction, but a tactical reason existed not to do so. 
          Blumenstetter also contends his trial counsel should have objected to the instruction
on parole, as it was an incomplete instruction. The charge concerning parole provided as
follows: 
          You are further instructed that in determining the punishment in this
case, you are not to discuss among yourselves how long the defendant will
be required to serve any sentence you decide to impose. Such matters
come within the exclusive jurisdiction of the Board of Pardons and Paroles
and are no concern of yours. 
 
          The Code of Criminal Procedure provides for a more detailed instruction on parole
and the award of good conduct time. Tex. Code Crim. Proc. Ann. art. 37.07, § 4(c)
(Vernon Supp. 2004). It provides, among other things, that the jury may consider the
existence of parole law and good conduct time, but it is not to consider the extent to which
good conduct time may be awarded to or forfeited by a particular defendant. Id. There
were ample tactical reasons for not objecting to the absence of this instruction. The full
detailed instruction would have placed the existence of parole and good conduct time
squarely within the jury's consideration. The charge to the jury, in this case, simply advised
the jury not to consider parole and good conduct time. Therefore, trial counsel's omission
in not objecting to this part of the court's charge on punishment did not fall below an
objective standard of reasonableness.
Conclusion 
          Blumenstetter did not preserve error on the forensic chemist's testimony concerning
a legal conclusion, and he was not harmed by the jury instruction on community
supervision. His trial counsel should have objected to the forensic chemist's testimony on
retrograde extrapolation and his testimony concerning Blumenstetter's intoxication beyond
a reasonable doubt. His trial counsel's deficiencies in this case, however, did not so
undermine the proper functioning of the adversarial process that the trial cannot be relied
on as having produced a just result. The Strickland prejudice prong was not satisfied
because Blumenstetter did not show that, but for counsel's unprofessional errors, the result
of the proceeding would have been different.
          We affirm the judgment.


                                                                           Donald R. Ross
                                                                           Justice 

Date Submitted:      April 5, 2004
Date Decided:         April 6, 2004

Publish